STATE of Missouri, Respondent,

v.

Paul Michael ANDERSON, Appellant.

Paul Michael ANDERSON, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 60954, 63103.

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 21, 1993.

Ellen H. Flottman, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for respondent.

SIMON, Presiding Judge.

Appellant, Paul Michael Anderson, appeals his convictions for murder in the first degree, § 565.020.1 R.S.Mo.1986 (all further statutory references shall be to R.S.Mo.1986 unless otherwise noted), for which he was sentenced to two consecutive terms of life imprisonment without parole. He also appeals the denial of his post-conviction relief (Rule 29.15) motion without an evidentiary hearing.

On appeal, appellant contends the trial court erred in: (1) denying his motion to suppress and admitting in evidence two audiotaped statements; (2) admitting into evidence and playing for the jury a videotaped reenactment of the crimes; (3) admitting in evidence two autopsy photographs of one of the victims; (4) permitting the prosecutor to elicit certain hearsay testimony; (5) overruling his challenges for cause of two venirepersons; and (6) submitting MAI–CR3d 302.04 defining "reasonable doubt." Appellant also contends the motion court erred in denying his Rule 29.15 motion, based on ineffective assistance of counsel, without an evidentiary hearing. We affirm.

Appellant does not contest the sufficiency of the evidence so we briefly review the evidence in a light most favorable to the verdict. On the evening of December 19, 1989, appellant was at the home of his friend, Tony Brumfield, whom he had known for approximately three weeks. Appellant had brought with him a .22 caliber rifle. Around 10:30 p.m., Brumfield's mother informed Brumfield that appellant would have to leave because she was going to work. Appellant stated that his mother was going to pick him up. When Mrs. Brumfield returned from work the next morning around 5:00 a.m., she checked her sons' room to find her two sons in bed, and appellant and his girlfriend, Dana Ruff, dressed in coats getting ready to leave. Mrs. Brumfield scolded her son about still having company, and appellant stated that his mother had not come to pick him up and that his girlfriend came over to pick him up. Appellant and Ruff then left the apartment together.

Ruff dropped appellant off at a subdivision near the home of James and Armida Frederick, the victims. Appellant cut through some yards and entered the victims' garage around 5:30 a.m. through a side door which he knew to be unlocked. He waited in one of the victims' cars until approximately 11:00 a.m. when he heard the front door of the house open. Appellant exited the car and moments later, Mrs. Frederick entered the garage. Appellant demanded her purse and Mrs. Frederick began to scream. Appellant then shot Mrs. Frederick in the head, causing her to collapse to the floor of the garage. Appellant began going through her purse when he heard someone else coming from the house. He stepped back, and moments later Mr. Frederick came into the garage and attended to his wife. When Mr. Frederick turned around, appellant shot him in the head and face several times. One of the shots transected the brain stem and midbrain, causing Mr. Frederick's virtually instantaneous death. Appellant then entered the house, took Mr. Frederick's wallet and some car keys, and telephoned Brumfield to tell him what he had done and that he was on his way over. Appellant returned to the garage to find the main garage door open and Mrs. Frederick gone. She had managed to seek help from a neighbor, who called the police,

but she later died from an epidural hemorrhage as a result of the gunshot wound to the head. Appellant then took one of the victims' cars, and proceeded to Brumfield's apartment. There, appellant changed his pants which were stained with blood, and showed Brumfield the various credit cards he had taken from the victims. Brumfield threw some of the cards under his mattress, and he and appellant walked to Pizza Hut for lunch. After appellant paid for the pizza with money he had taken from the victims, the two of them went back to the victims' car and drove to a clothing store where they used the victims' credit card to buy coats and hats. They then went to another store to buy more clothes, but the clerk there would not honor the credit card without identification. The two then picked up Brumfield's cousin, Jermain Stigler, in Pine Lawn, and the three went to St. Louis Centre to continue their shopping spree. They tried to buy shoes at one store which would not honor the credit card without identification. Next, the three decided they wanted some gold jewelry, so appellant attempted to purchase the jewelry while Brumfield and Stigler went into a department store. When Brumfield and Stigler came out of the department store they saw security officers from St. Louis Centre with appellant, so they left in the victims' car. The clerk at the jewelry store, suspecting the card was stolen, had called the credit card company and was informed that the card was probably stolen. Since this could not be confirmed at the time, appellant was asked by the clerk to leave and come back with proper identification. Eventually the credit card company confirmed that the card was stolen, and the police were called. The police then showed a photo line-up to two clerks at the jewelry store and the two security guards. Three of the four were able to positively identify appellant as the one trying to use the credit card.

After appellant left St. Louis Centre and realized that his friends had left him, he called his girlfriend who gave him a ride to his grandmother's house. Meanwhile, Brumfield and Stigler drove to the apartment of a friend of Brumfield, took the murder weapon, which had been in the back seat of the victims' car the whole time, and buried it in the snow alongside an apartment building. Stigler then dropped Brumfield off near his home, and drove himself home to Pine Lawn where the car was abandoned. During the evening, police learned that Dana Ruff was appellant's girlfriend. Ruff was interviewed by police as a potential witness, for information in order to locate appellant. After being interviewed at the police station, she returned home where she consented to a search of her automobile. During the search police located a live .22 caliber round on the floorboard of her car. During the same time period, police were interviewing Brumfield who implicated Ruff as being involved in the murders. Brumfield also led police to the location of the murder weapon. Ruff was subsequently taken into custody and transported to the police station as a suspect in the murders. Eventually, appellant was arrested at his grandmother's house around 10:30 p.m. that night, made audiotaped incriminating statements, and walked through a videotaped reenactment of the incident. After a five day trial at which these items were admitted in evidence, appellant was convicted. Appellant put on no evidence at the trial. Other facts will be supplied as necessary to resolve appellant's points on appeal.

In his first point, appellant claims the trial court erred in overruling his motion to suppress, and admitting in evidence, the two audiotaped confessions made by appellant while in custody the night he was arrested, because the statements were taken in violation of his privilege against self-incrimination. He claims that, although he was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the statements were involuntary under the totality of the circumstances which included his youth, the inherently coercive environment, and that he had been questioned continuously since 11:00 p.m. the night of the murders and taken out into the bitter cold without a coat during that time.

■ Ordinarily, a ruling on a pre-trial motion to suppress may not be asserted as a ground of error on appeal because the pre-trial motion to suppress and the admission at trial of the challenged evidence are not two

distinct procedures. *State v. Vinzant*, 716 S.W.2d 367, 372 (Mo.App.1986) The real damage is not done until the evidence is introduced in the trial of the case. *Id.* Here, however, since objections at trial to the admission of appellant's confessions were based upon the previous motions to suppress, we shall refer to the pre-trial proceedings to determine the propriety of the trial court's admission of appellant's confessions at trial.

■ Once a defendant properly questions the voluntariness of his pre-trial statement, the state has the burden of proving by a preponderance of the evidence that the statement was voluntary. *State v. Hart*, 805 S.W.2d 234, 238[8–10] (Mo.App.1991). The essential determination is whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given. *Id.* The test for determining voluntariness is whether under the totality of the circumstances defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he made the statements. *Id.* Absent a showing of special circumstances, the state need only make a prima facie showing of voluntariness. *Id.*

■ In reviewing the trial court's ruling on a motion to suppress, the facts and reasonable inferences arising therefrom are to be stated favorably to the order challenged on appeal and we may disregard all contrary evidence and inferences. *State v. Smith*, 812 S.W.2d 225, 226[1] (Mo.App.1991). The evidence surrounding appellant's arrest and detention, adduced at the suppression hearing and at trial, reveals that appellant was arrested at his grandmother's house at approximately 10:30 p.m. on December 20, 1989, the evening of the murders. He was then taken to the police station in Clayton. At approximately 11:07 p.m., appellant was contacted in an interview room by Detective Tim Hagerty of the St. Louis County Police. Hagerty asked appellant if he wanted anything to drink or needed to use the rest room, and appellant declined. Appellant was then advised of his *Miranda* rights through the use of a warning and waiver form. Appellant

initialed next to each right on the form as it was read to him to indicate that he understood it, and he also signed the form acknowledging that he understood his rights, that he was willing to make a statement, that he did not want a lawyer, that he knew what he was doing, that no promise or threats had been made to him, and that no pressure or coercion of any kind had been used against him. Appellant then indicated he wished to make a statement, during which he implicated himself in the murders. Detective Hagerty testified that during this statement appellant's attitude was very calm, that he talked very matter-of-factly, very soft-spoken, and that he was very cooperative.

Hagerty then asked appellant if he would be willing to make a tape recorded statement explaining in detail what he had done and what they had talked about verbally. The taped statement began at approximately 12:20 a.m. on December 21, 1989. Appellant was again advised of his *Miranda* rights on the tape and indicated a willingness to make a statement, which lasted about nineteen minutes.

After completing this statement, appellant agreed to go back to the victims' home and be videotaped reenacting the event as it occurred. Before going to the victims' home, around 2:00 a.m., Hagerty had appellant stand for a photograph next to the victims' car which had been found in Pine Lawn. Appellant was then taken to the victims' home where he was again advised of his *Miranda* rights, and asked to explain what happened. After walking through the events of the murder, appellant was given food and drink and taken back to the police station in Clayton around 4:00 a.m. Hagerty interviewed appellant again at 5:30 a.m., after orally advising him of his rights, during which appellant stated that he had planned for a week to kill the victims and then rob them. Hagerty then went home and realized that he had not had appellant's 5:30 a.m. statement committed to audiotape, so he called Sergeant Ted Zinselmeyer and asked him to interview appellant and record his statement. Sgt. Zinselmeyer entered the interview room where appellant was sleeping, advised appellant of his rights, asked him if

he understood his rights, and asked appellant to make a statement. Appellant then gave an audiotaped statement to the effect that the murders were pre-planned. Both audiotaped confessions were played for the jury over appellant's objections.

Appellant claims that under the totality of the circumstances, his confession was not voluntary. One of these circumstances is the fact that he was taken out in the cold for several hours dressed only in an orange jail jump suit and a sweater. However, the record reveals that appellant was in a car the whole time except for the amount of time it took to photograph him standing next to the victims' car and the time it took to do the videotaped reenactment. The videotape is approximately eight minutes long. The record reveals that appellant was back in the police station at approximately 4:00 a.m. Appellant makes no assertions as to how his being out in the cold was a factor in coercing him to make the 5:30 a.m. or 8:30 a.m. statements.

Other factors appellant cites include the fact that he was only eighteen years old and the fact that he was awake all night. He does not explain, however, how his age bears on his ability to decline to give a statement. Appellant is a high school graduate, with the ability to read and write, and was advised numerous times of his right not to speak. There is no claim that he suffered from any disability nor that he does not have the intelligence requisite with his age. *See, State v. Bailey,* 714 S.W.2d 590, 594[8] (Mo.App. 1986).

The record also reveals no evidence to suggest that appellant was so tired that his will was overborne at the time he gave his statement. Appellant was not continuously questioned throughout the night, but rather, was interviewed in a series of sessions and read his *Miranda* rights prior to each. No evidence suggested that appellant requested an opportunity to sleep, or that he ever requested the interview be terminated. No evidence suggests that such requests would have been denied had they been made.

■ The record reflects that appellant was not handcuffed while in the interview room at the police station, that he was given food and drink, and that he was given an opportunity to use the rest room. In short, the record reflects no evidence of coercive activity on the part of the police to indicate appellant's statements were less than voluntary. Coercive police activity is a necessary predicate to the finding that a statement is not voluntary. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986). Further, the jury was instructed, pursuant to MAI–CR3d 310.06, that if they did not find and believe that the statements were freely and voluntarily made under all the circumstances surrounding and attending them, that they must disregard them and give them no weight in their deliberations. Point denied.

■ Appellant's second point is that the trial court erred in admitting in evidence and playing for the jury exhibit 137, a videotape of appellant reenacting the crimes. Appellant claims the videotape was irrelevant, cumulative and prejudicial since it would have affected the jury out of proportion to its value as evidence. The video consisted of appellant explaining and demonstrating his actions at the crime scene as they occurred, with two police officers standing in as the victims.

■ While appellant initially objected to admission of the videotape at trial, the objection was withdrawn and appellant requested that the tape be shown to the jury. No claim of error was contained in his motion for new trial. Our review, therefore, is for plain error. Rule 30.20. Under plain error review appellant bears the burden of demonstrating the trial court committed an error which so substantially affected his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected. *State v. Lewis,* 809 S.W.2d 878, 879[1] (Mo.App.1991).

In support of his point, appellant relies mainly on *State v. Caudill,* 789 S.W.2d 213 (Mo.App.1990). In *Caudill,* the court held that videotape of a crime scene is admissible, within the trial court's discretion, upon weighing the probative value against the prejudicial effect, *Id.,* at 215[7, 8], and that deference should be given to the trial court's discretion in admitting a videotape of a crime

scene in evidence. *Id.* However, the court also held that a videotaped reenactment of a crime, where the victim reenacts the crime with a third party playing the role of the defendant, is inadmissible. *Id.,* at 216[9]. The *Caudill* court, relying heavily on *Lopez v. State,* 651 S.W.2d 413 (Tex.App. 2 Dist. 1983), stated:

> In *Lopez* it was held that a videotape reenactment of a crime is inadmissible. In *Lopez,* at 414–15, the court stated that "the concept of recreating human events with the use of actors is a course of conduct that is fraught with danger. The general appearance of an actor, his facial expression or slightest gesture, whether intended or not, may sway a juror who has listened to lengthy testimony. The danger of jurors branded with television images of actors, not testimony is too great to ascertain."

The court found, however, that since the evidence of guilt was overwhelming, the error in admission of the videotape was harmless. *Caudill,* at 217[12]. Thus, in *Caudill* it is clear that we are concerned with the dangers associated with actors playing the part of the defendant. Here, defendant himself reenacted the events and this concern is not present. Informative in our particular situation is *People v. Dabb,* 32 Cal.2d 491, 197 P.2d 1, 5[7] (1948), where the court stated:

> A motion picture of the artificial re-creation of an event may unduly accentuate certain phases of the happening, and because of the forceful impression made upon the minds of the jurors by this kind of evidence, it should be received with caution. As pointed out by Wigmore, such a portrayal of an event is apt to cause a person to forget that "it is merely what certain witnesses say was the thing that happened" and may "impress the jury with the convincing impartiality of Nature herself." (3 Wigmore, Evidence [3rd ed.], § 798a, p. 203) However, when the events which are being photographed consist of a voluntary reenactment by the accused of what occurred, there is little, if any, danger of misleading emphasis which is unfavorable to him. Moreover, as a method of presenting confessions, sound motion pictures appear to have a unique advantage in

that, while presenting the admission of guilt, they simultaneously testify to facts relevant to the issue of volition.

*Accord, Grant v. State,* 171 So.2d 361, 363–5[4] (Fla.1965); *cert. denied,* 384 U.S. 1014, 86 S.Ct. 1933, 16 L.Ed.2d 1035 (1966); and *State v. Palmer,* 227 La. 691, 80 So.2d 374, 383 (1955). *See generally,* Annot., 41 ALR4th 812, 858–863.

The fact that two police officers were used to represent the victims does not render this videotape inadmissible. The officers did not attempt any dramatization or recreation of the victims' actions, but merely assumed the positions in the garage which appellant stated the victims were in before and after he shot them. They were not "actors" as that term is used in *Caudill.*

▬ Appellant argues that the videotape was prejudicial because deliberation was a highly contested fact issue, and he appeared calm and collected in the videotape. In *State v. Garrett,* 595 S.W.2d 422, 434[29] (Mo.App.1980), the defendant claimed that his videotaped confession showed him in a less than favorable light, encouraged by police, smoking and laughing while relating his confession. The court found that the defendant could not claim error because the tape accurately portrayed the manner in which he chose to present himself. *Id.* Here, if appellant's demeanor as shown on the videotape is probative on the issue of deliberation, and is thus prejudicial to him, this alone is no basis for holding the videotape inadmissible. The very nature of evidence which has probative value as to an element of the offense charged is necessarily prejudicial. *See, State v. Shaw,* 636 S.W.2d 667, 672 (Mo. banc 1982); *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982) ("Any incriminating evidence is by definition prejudicial."). The decision whether potentially prejudicial or inflammatory evidence should be admitted lies within the sound discretion of the trial court which is in a better position to balance the probative value and danger of the evidence. *Id.* Here, the trial court did not abuse its discretion. Point denied.

Appellant's third point is that the trial court erred in admitting in evidence exhibits

65 and 67, autopsy photographs of James Frederick, because he claims any probative value the photographs may have had was outweighed by their prejudicial effect. Appellant contends the photographs were cumulative, repetitious, gruesome and unduly inflammatory. While objection to admission of these exhibits was made at trial, the issue was not contained in the motion for new trial and therefore not preserved for appellate review. *State v. Jennings,* 649 S.W.2d 448, 452 (Mo.App.1983). Therefore, we review only for plain error.

 A trial court has broad discretion regarding the admission of photographic evidence, and as long as the photograph has potential value to assist in the jury's understanding of verbal testimony or to corroborate such testimony, the appellate court may not overturn its admission by the trial court. Even though gruesome, photographs may be admitted to show the nature and location of wounds, depict the location and condition of the body, or to establish any other element of the state's case. *State v. Mease,* 842 S.W.2d 98, 108[13, 14] (Mo. banc 1992); *cert. denied,* —— U.S. ——, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993).

 Here, the photographs were described by the state's pathologist as showing the nature and location of the wounds which caused the death of James Frederick. Also, the pathologist used the photographs to assist him in explaining to the jury his testimony regarding the nature, location and extent of the victims' wounds. As such, the photographs had potential to assist the jury in understanding the pathologist's testimony. The trial court did not plainly err in the admission of the photographs.

In his next point, appellant claims the trial court erred in allowing the prosecutor to elicit testimony from Detective Tim Hagerty to the effect that Jeffrey McCullogh, a friend of appellant, had seen appellant driving the victims' car out of their driveway. Detective Hagerty testified that the police were unable to locate McCullogh for trial. Appellant contends that the testimony was inadmissible hearsay and deprived him of his rights under the United States and Missouri Constitutions. No objection to this testimony was made at trial, nor was the issue included in appellant's motion for new trial. Thus, the issue is not preserved and our review is only for plain error.

 Hearsay which goes in the record without objection may be considered by the jury. *State v. Wallace,* 825 S.W.2d 626, 632[10] (Mo.App.1992). Further, where no objection is made, the admission of hearsay evidence is not plain error. *State v. Lewis,* 809 S.W.2d 878, 879[2, 3] (Mo.App.1991). In any event, the statement here was admissible for the nonhearsay purpose of showing why Detective Hagerty's investigation focused on appellant. The record shows that on cross-examination, defense counsel elicited from Detective Hagerty that neither of the neighbor witnesses, Michael Lewis or Kevin Lewis, had told him that it was appellant in the car that backed out of the victim's driveway. Defense counsel was also able to get Detective Hagerty to agree that no one had told him appellant was the one in the victims' car until Detective Albert honed in on appellant. On redirect, the prosecutor elicited from Detective Hagerty that neither Kevin Lewis nor Michael Lewis had told him that appellant drove away in the victims' car, but that that information had come to him as part of the investigation from Jeffrey McCullough. Detective Hagerty was further questioned on redirect when the prosecutor elicited from him that he was incorrect in stating on cross-examination that no one had told him appellant was driving away from the victims' house in their car. Thus, this testimony was nonhearsay, admissible to rebut the implication that the police began suspecting appellant without probable cause. We find no manifest injustice. Point denied.

Appellant's next point is that the trial court erred in overruling two of his challenges for cause of two venirepersons, denying him his right to a full panel of qualified jurors from which to make his peremptory challenges, in that the two venirepersons gave answers on voir dire indicating they would give more weight to police officers' testimony and be unable to evaluate their credibility without reference to their profession.

On voir dire, defense counsel questioned venireperson Jeffrey Hockert as follows:

[DEFENSE COUNSEL]: You would give—if there were conflicting testimony, you would give more weight to the police officer's testimony because he's a police officer?

\* \* \* \* \* \*

Yes, sir, and that is Mr. Hockert?

VENIREPERSON HOCKERT: Conflicting testimony, I would believe the—leaning more towards a police officer.

[DEFENSE COUNSEL]: Well, leaning is something different than giving them more weight to this testimony. Let me ask you this: If there's conflicting testimony, as a number of people have indicated in this jury room, would you be more likely—would you give more weight to the police officer's testimony just because he's a police officer?

VENIREPERSON HOCKERT: I believe so, yes.

[DEFENSE COUNSEL]: All right. Would you give—if a lay witness should testify and a police officer should testify, would you automatically give more weight to the police officer's testimony because he's a police officer?

VENIREPERSON HOCKERT: No.

[DEFENSE COUNSEL]: So it's in the conflicting testimony situation?

VENIREPERSON HOCKERT: Correct.

Subsequently, defense counsel questioned venireperson Mary Ann Lucchesi on the same topic as follows:

VENIREPERSON LUCCHESI: More I think about it now, I would agree with some of these other people. If there is conflicting testimony, I would have to tend to be on the side of the policeman and a doctor, whoever, a professional person that is testifying.

[DEFENSE COUNSEL]: Okay. All right. And would that be in the conflicting testimony scenario? Would it be a laymen, say, or another witness versus a police officer, you would give the police officer more credibility because he's a police officer?

VENIREPERSON LUCCHESI: I think so.

[DEFENSE COUNSEL]: I appreciate your honesty, ma'am.

The prosecutor then questioned each of these venirepersons as follows:

[PROSECUTOR]: Same question. Will you wait until you hear all of the testimony in the case before you pass upon the credibility or weight to be given to any particular witness?

VENIREPERSON HOCKERT: I will.

[PROSECUTOR]: Will you consider what you know about the witnesses in determining that credibility?

VENIREPERSON HOCKERT: Yes.

[PROSECUTOR]: Does that include the fact that it may be a police officer?

VENIREPERSON HOCKERT: Yes.

[PROSECUTOR]: Or a doctor?

VENIREPERSON HOCKERT: Yes.

[PROSECUTOR]: Or a neighbor, for that matter, that's lived in the neighborhood for twenty years testifying about the neighborhood? You will wait until you hear all of this before determining—

VENIREPERSON HOCKERT: Yes.

[PROSECUTOR]: You're not telling us now either, are you, that no matter what the police or anybody else has to say, you're going to believe it before you ever hear him? You are not telling me that now, are you?

VENIREPERSON HOCKERT: No.

[PROSECUTOR]: You will wait to hear it first, correct, and then decide?

VENIREPERSON HOCKERT: Correct.

[PROSECUTOR]: Thank you, sir.

– – – – – – – –

[PROSECUTOR]: I know it's repetitious, but the same questions. Will you wait until all the evidence has been heard and at this time make your determination as to what you believe and what you don't believe?

VENIREPERSON LUCCHESI: Yes, I will.

[PROSECUTOR]: Will you consider everything you know about each witness testifying?

VENIREPERSON LUCCHESI: Yes.

[PROSECUTOR]: That includes police officers?

VENIREPERSON LUCCHESI: Yes.

[PROSECUTOR]: You will wait until you hear the officer, what they have to say, what they're talking about, their background and experience and training—

VENIREPERSON LUCCHESI: Yes.

[PROSECUTOR]: —before you make a determination as to what they're telling you is true or not true?

VENIREPERSON LUCCHESI: Right, I will.

[PROSECUTOR]: There's no blind allegiance on your part either, is that correct?

VENIREPERSON LUCCHESI: That's correct.

They were each questioned by defense counsel once again as follows:

[DEFENSE COUNSEL]: Mr. Hockert?

VENIREPERSON HOCKERT: Yes.

[DEFENSE COUNSEL]: Did you tell me before, sir, that in conflicting testimony between a lay witness and a policy officer that you would give more weight to a police officer's testimony just because he's a police officer? Is that what you told me?

VENIREPERSON HOCKERT: I would lean that way, yes, ma'am.

[DEFENSE COUNSEL]: Do you feel that way now?

VENIREPERSON HOCKERT: I feel I could evaluate the situation as it occurred.

[DEFENSE COUNSEL]: Okay. Oh, you're changing—have you rethought it and changing a little bit what you said earlier to me? Was I incorrect in saying that's what you said to me?

VENIREPERSON HOCKERT: No, I don't think you were.

[DEFENSE COUNSEL]: Do you still feel that way, sir; that you would give more weight to the police officer's testimony just because he's a police officer?

VENIREPERSON HOCKERT: I would lean that way, yes.

[DEFENSE COUNSEL]: Thank you.

— — — — — — — —

[DEFENSE COUNSEL]: Ms. Lucchesi?

VENIREPERSON LUCCHESI: Yes.

[DEFENSE COUNSEL]: Did you not tell me before in a case of conflicting testimony between a lay witness and a police officer that you would give more weight to a police officer's testimony just because he is a police officer?

VENIREPERSON LUCCHESI: Yes, but I have to justify that by saying it all depends on what I'm—you know, the evidence and the facts, and I mean—

[DEFENSE COUNSEL]: I'm asking you about this one specific thing. If you have conflicting testimony from a lay witness and a police officer, are you going to give more weight to that police officer's testimony just because he's a police officer?

VENIREPERSON LUCCHESI: It would have to all depend if they were there. I don't know. It all depends on the set of facts. I really can't—I don't know.

[DEFENSE COUNSEL]: Did you tell me that a while ago?

VENIREPERSON LUCCHESI: Well, I thought he would probably—on the same set of facts, the person who is conflicting against the police officer, I would probably tend to go with the police officer.

[DEFENSE COUNSEL]: What I'm asking is that would be because he's a police officer?

VENIREPERSON LUCCHESI: Yes, probably.

[DEFENSE COUNSEL]: Thank you, ma'am.

Both venirepersons Lucchesi and Hockert were the subject of defense motions to strike for cause based on the assertion that they stated they would give more weight to a police officer's testimony just because he was a police officer. In the case of venireperson Lucchesi the trial court stated that, on further inquiry, she said she would consider each witness before reaching a decision on believability. With regards to venireperson Hockert the trial court stated that the veni-

reperson, on further inquiry, indicated a willingness to wait and listen to the testimony and weigh the evidence.

 The trial court possesses broad discretion in determining the qualifications of prospective jurors; the trial court's ruling will not be disturbed on appeal unless the ruling is against the evidence and constitutes a clear abuse of discretion. *State v. Lingar,* 726 S.W.2d 728, 733 (Mo. banc 1987); *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). An accused must be afforded a full panel of qualified jurors before he is required to expend his peremptory challenges. *Id.,* at 734[5]. Failure of the trial court to grant a legitimate challenge for cause is reversible error. *Id.* Absence of an independent examination by the trial court, as in the present case, justifies a more searching review by an appellate court of the challenged juror's qualifications. *Id.*

The critical question is whether, on the whole, the venirepersons' responses indicate an ability to evaluate the evidence fairly and impartially. *Id.,* at [6]. Recognizing the importance of this inquiry, we are mindful that the trial court, in its unique position to observe the intangibles of gesture, inflection and demeanor, occupies the best position to determine the qualifications of a prospective juror. *Id.* Since appellant did not present the issue in his motion for new trial, the issue is not preserved and we review only for plain error.

 Neither venireperson Lucchesi or Hockert served on the jury, and appellant makes no assertion that the jurors which determined his guilt were not fully qualified. In addition, the evidence of appellant's guilt, including two audiotaped statements and a videotaped reenactment of the crime, was overwhelming. "Where guilt is established by overwhelming evidence, no injustice or miscarriage of justice results from a refusal to invoke the plain error rule." *State v. Lewis,* 809 S.W.2d at 878[1]. Point denied.

 In his next point, appellant claims the trial court erred in submitting MAI–CR3d 302.04, defining proof beyond a "reasonable doubt" as proof which leaves the jury "firmly convinced" of appellant's guilt. Appellant claims this definition allowed a finding of guilt based on a degree of proof below that required by due process.

Our Supreme Court has held that the term "firmly convinced" is "intended to assist lay jurors in their understanding of the legal phrase 'beyond a reasonable doubt' [and that] 'firmly convinced' is essentially synonymous with 'beyond a reasonable doubt.'" *State v. Antwine,* 743 S.W.2d 51, 62–63[12] (Mo. banc 1987); *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). This holding has not changed. *State v. Griffin,* 848 S.W.2d 464, 469[8] (Mo. banc 1993). The trial court did not err in submitting the instruction.

In his next point, appellant claims the motion court erred in overruling his Rule 29.15 motion based on five claims of ineffective assistance of counsel. Each of these claims is set out as a separate subpoint to appellant's point on appeal.

 Review of appellant's Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j). The motion court's findings and conclusions are clearly erroneous only if a review of the entire record leaves this court with a definite and firm impression that a mistake has been made. *State v. White,* 798 S.W.2d 694, 697[6] (Mo. banc 1990).

 To prevail on an ineffective assistance of counsel claim, a movant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). To prove deficient performance a movant must show that counsel's acts or omissions were outside the range of professionally competent assistance. *Id.* To do this movant must overcome the presumption that counsel's challenged acts or omissions were sound trial strategy. *State v. Flenoid,* 838 S.W.2d 462, 470[18–21] (Mo. App.1992). To show prejudice, a movant must show there was a reasonable probability that, but for the errors of his counsel, the jury would have had reasonable doubt respecting his guilt. *Id.* If a movant makes

an insufficient showing on either the deficient performance component or the prejudice component, the court need not address the other component. *Id.*

In his first subpoint, appellant claims trial counsel was ineffective for failing to object, include in a motion for new trial, and preserve for appellate review an objection to the testimony of Detective Hagerty that he was certain that appellant had committed the crimes charged since such constituted improper opinion evidence which invaded the province of the jury. The testimony to which appellant refers is as follows:

[PROSECUTOR]: Let me just ask this one other question. Would you tell the jury why it is that you do not tell a murder suspect the facts and circumstances that you know of surrounding the murders? [HAGERTY]: Certainly. If I were to sit down and give the suspect the facts and circumstances and every piece of evidence that I know before he makes his statement, then that's not a confession. He is simply repeating to me what I told him. I wanted to make certain that he could tell me everything that happened inside that home and everything that went up to planning it. That way I knew myself that he in fact was the one that did it. I am absolutely convinced of that.

In his Rule 29.15 motion, appellant alleged that the statement made by Detective Hagerty "was to the effect that 'he was absolutely certain that movant committed the crimes.'" With respect to this allegation, the motion court stated, in pertinent part:

An examination of the testimony of Mr. Hagerty during the trial fails to reveal any testimony fully consistent with the quoted testimony in the motion, and Movant has failed to cite the Court to such a statement. There is no factual basis to support Movant's claims. Even if there had been such testimony as to Mr. Hagerty's opinion within the nearly 230 pages of his testimony, the Court finds that one such reference of his opinion would not have prejudiced Movant. This claim is without merit and is denied.

The record reflects that defense counsel, on cross-examination, placed the voluntariness of appellant's confession in question. The essence of Detective Hagerty's statement was that he was certain that appellant's confession was voluntary and reliable. Therefore, counsel was not ineffective for not objecting. In any event, considering Detective Hagerty's testimony in its entirety, this statement did not have an effect on the outcome of the trial. As such, appellant was not prejudiced.

Appellant's second subpoint asserts ineffective assistance based on counsel's failure to object to Detective Hagerty's testimony regarding the statements of Jeffrey McCullogh. This issue was raised, and decided adversely to appellant, as a point of trial court error on direct appeal. Claims raised and determined adversely to appellant on direct appeal may not be relitigated by attempting to transform the claim into a claim of ineffective assistance of counsel. *Clemmons v. State,* 785 S.W.2d 524, 530[16] (Mo. banc 1990); *cert. denied,* 498 U.S. 882, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990). Moreover, the basis for this court's finding of no manifest injustice on direct appeal serves to establish a finding of no prejudice under *Strickland. Id.*

In his next subpoint, appellant claims counsel was ineffective for failing to preserve for appellate review the claimed trial court error of overruling motions to strike venirepersons Lucchesi and Hockert for cause. Again, this issue was raised on direct appeal and decided adversely to appellant. Therefore, failure to preserve this issue did not prejudice appellant. *Id.*

In his next subpoint, appellant claims counsel was ineffective for not objecting to or preserving for review an objection to the testimony of Police Officer John Schmidt. Officer Schmidt testified that he was the first officer to respond to the crime scene. He testified that after speaking with neighbor witnesses and seeing Mrs. Frederick lying on the floor of a neighbors' home, he and Officer Kopfensteiner went to the victims' house to look for other victims or suspects. He testified that no one besides he, Officer Kopfensteiner and the paramedics

went into the victims' house or garage before it was secured.

Appellant claims this testimony was objectionable since Officer Schmidt had no way of knowing what had transpired before his arrival, and that it was highly misleading and prejudicial since it would have led the jury to believe that Officer Schmidt had additional knowledge of the crime than his testimony indicated.

The record reflects, however, that Officer Schmidt was testifying only to the extent of his knowledge, and was not purporting to claim knowledge of other things. In any event, appellant does not claim that the additional knowledge which appellant claims the jury would have believed Officer Schmidt possessed was revealed in any way. Thus, we perceive no prejudice to appellant in counsel's failure to object to this testimony.

■ Appellant next claims trial counsel was ineffective for failing to object to the testimony of Tony Brumfield that he had last seen appellant the "night he did the murder," the testimony of a Detective Albert about the "murders," or the testimony of Officer Welling regarding the statement of Tony Brumfield concerning the "murder weapon." Appellant contends this testimony constituted improper opinion evidence which invaded the province of the jury, that Officer Welling's testimony was also improper hearsay, and that counsel was ineffective for not objecting.

As the motion court stated in its findings of fact, an examination of the transcript and testimony presented in the entire cause reveals that the fact that the victims had been murdered was not a truly contested issue. Moreover, in addition to the statement at issue, Brumfield also testified appellant had told him details about how he had killed and robbed the victims. Brumfield testified about discussions with appellant the night before the murders regarding the planning of the action, and also testified regarding their activities the next day after the murders had taken place. He testified that appellant telephoned him from the Frederick's house and stated that he had shot the victims. He testified that they ate lunch at Pizza Hut, and that appellant even cracked a joke about how the bullet looked as he watched it spiral

towards Mr. Frederick's face. He testified that they then went on a shopping spree with the Fredericks' credit cards. All of this testimony leads to the conclusion that, in the whole context of Brumfield's testimony, appellant was not prejudiced from Brumfield's statement that he had last seen appellant the "night he did the murder."

The testimony of Detective Albert to which appellant claims trial counsel should have objected was actually contained in one of the prosecutor's questions. Detective Albert stated that he had brought to Detective Hagerty's attention the fact that he was familiar with an individual who lived across the street from the victims. The prosecutor asked Detective Albert if he did this while he "and Hagerty and the others were still at the scene of the murders," to which Detective Albert responded affirmatively. As stated, the fact that the victims had been murdered was not a contested issue. Moreover, defense counsel repeatedly referred to the victims as having been "brutally murdered," and "murdered." As such, appellant suffered no prejudice from this testimony.

■ The testimony of Officer Welling, about which appellant now complains, was a statement to the effect that Brumfield had led the police to an apartment complex, pointed to an area that was snow covered and said, "If you'll push the snow off, that's where you'll find the murder weapon." Appellant claims this statement was objectionable because it invaded the province of the jury. Again, the record reflects that the fact that the victims had been murdered was not a contested issue. Moreover, defense counsel repeatedly referred to the gun in question as the "murder weapon." As such, appellant was not prejudiced by this one statement in Officer Welling's testimony.

■ Appellant also claims that Officer Welling's testimony was objectionable because it was hearsay. The motion court found, however, and we agree, that the statement was not admitted for the truth of the matter asserted therein, but rather to explain the manner by which the police located the murder weapon from the snow alongside an apartment complex. As such, the testi-

mony was not objectionable as hearsay, and counsel was not ineffective for not making a nonmeritorious objection.

Since the motion court was not clearly erroneous in denying appellant's claims of ineffective assistance of counsel, appellant's point is denied.

For his final point, appellant claims the motion court erred in denying his Rule 29.15 motion without an evidentiary hearing on his claim that counsel was ineffective in failing to cross-examine Tony Brumfield on the matter of whether he had made a deal with the state to testify, and for failing to submit an instruction on felony murder. Appellant claims he pleaded factual allegations not refuted by the record which, if proved, would warrant relief on his claim.

■■■■ Again, review of appellant's Rule 29.15 motion is limited to a determination of whether the findings and conclusions are clearly erroneous. Rule 29.15(j). To be entitled to an evidentiary hearing on the issue of ineffective assistance of counsel, a movant seeking relief under Rule 29.15 must plead facts, not conclusions, which, if true, would warrant relief. *State v. Flenoid,* 838 S.W.2d at 470[2]. The allegations must be unrefuted by the record, and the matters complained of must have prejudiced the movant. A hearing is not required if the motion, files and records of the case conclusively show that the movant is not entitled to relief. Rule 29.-15(g); *id.* Subjects covered and the extent of cross-examination are matters of trial strategy and must be left to the judgment of counsel. *Chambers v. State,* 809 S.W.2d 27, 29[1] (Mo.App.1991).

■■■■ Appellant's position on appeal is that counsel should have cross-examined Brumfield about the fact that as a condition of his probation he cooperate with the St. Louis County Prosecuting Attorney in the prosecution of appellant. This position, however, is inconsistent with the allegation in appellant's motion. His motion contains no allegation that any such condition or any other deal was made in exchange for Brumfield's testimony. Therefore, as the motion court found, appellant failed to allege facts which would support a claim for relief. In any event, the record shows that trial counsel questioned Brumfield's mother regarding the fact that Brumfield was charged as a juvenile with acting in concert with another in murder first degree, that he was being kept under general juvenile court supervision, that he was not certified to stand trial as an adult, and that he was not charged with murder in the first degree, as appellant was, as an adult. Also, the prosecutor elicited from Brumfield himself that he was in the custody of the juvenile court and not certified as an adult. On cross-examination of Brumfield, defense counsel elicited from Brumfield the facts that he had pled guilty in Juvenile Court to two counts of murder in the first degree, and that he would be released from juvenile court jurisdiction on January 28, 1992. The record contains numerous other references, by both the prosecutor and defense counsel, to the status of Brumfield as a juvenile and the relatively early date of his release from the custody of juvenile authorities. As such, the jury was made aware of the information on which appellant claims Brumfield should have been cross-examined. Thus, the record conclusively shows that appellant was not prejudiced.

Appellant claims also that the motion court should have held an evidentiary hearing on his claim that counsel was ineffective for not requesting an instruction on murder in the second degree under a theory of felony murder. The jury was instructed on murder in the first degree, MAI–CR3d 313.02, and, at the request of defense counsel, murder in the second degree-conventional, MAI–CR3d 313.-04.

■■■■ Assuming there was evidence to support the giving of an instruction on second degree felony murder, appellant was not prejudiced by counsel's failure to request such an instruction. As stated, the jury was instructed on the lesser included offense of second degree conventional murder. As our Supreme Court has stated, "It is a second degree conventional murder instruction, not a second degree felony murder instruction, which sufficiently tests a jury's belief of the crucial facts for a conviction of first degree murder.... The jury had the opportunity to convict defendant of second degree con-

ventional murder but did not do so. An additional instruction on second degree felony murder would have made no difference." *State v. Griffin,* 756 S.W.2d 475, 485[11] (Mo. banc 1988); *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). (Citation omitted.) The record conclusively refutes appellant's claim that he was prejudiced as a result of counsel's failure to request a felony murder instruction. Thus, the motion court was not clearly erroneous in denying appellant's claims of ineffective assistance of counsel without an evidentiary hearing. Point denied.

Judgments affirmed.

STEPHAN and PUDLOWSKI, JJ., concur.