**STATE of Missouri, Respondent,**

v.

**Stacey A. LANNERT, Appellant.**

**Stacey A. LANNERT, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. 63563, 65387.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Nov. 8, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 8, 1994.

Application to Transfer Denied
Jan. 24, 1995.

Ellen H. Flottman, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for respondent.

DOWD, Judge.

Defendant appeals after a jury convicted her of murder in the first degree, § 565.020, RSMo.1986, and armed criminal action, § 571.015, RSMo.1986, for which she was sentenced to life imprisonment without the possibility of probation or parole for the murder conviction and a concurrent term of three years for the armed criminal action conviction. Also consolidated within this appeal, Defendant appeals the denial of her Rule

29.15 motion without an evidentiary hearing. We remand for a gender-*Batson* hearing and affirm with regard to all other issues.

Defendant does not challenge the sufficiency of evidence on appeal. The facts viewed in the light most favorable to the verdict reveal that Defendant, 18–year–old Stacey Lannert, was living with her father, Tom Lannert, and her 14–year–old sister at the time of the killing. Her mother and father were divorced, and her mother had remarried and was living in Guam. After the divorce, Defendant and her sister would live intermittently with their mother or father. Defendant's sister had also previously lived with other relatives.

Defendant claimed during trial that her father had sexually abused her approximately since she was in the third grade. Additionally, she claimed he was an alcoholic with a violent temper. Until shortly before the killing, Defendant had been living with her mother in Guam. Upon returning, she began to speak with friends about wishing her father were dead. She talked about either killing him herself or having him killed. A friend, Ron Barnett, told her what to do to her father's car so that it would explode when he was in it. This plan did not work, so Barnett then advised her how to shoot her father in such a way that the police would suspect a burglar did it. Defendant later brought a rifle to her grandparent's home in Illinois to practice using it.

Also around the time of Defendant's return from Guam, she began fraudulently using her father's credit cards and cashing checks on his bank account. She instructed male friends to pose as her father on the telephone when a check-cashing business would call to verify her authority to cash the checks. With the money she fraudulently received from the credit cards and checks, among other things she bought herself a car stereo, bought others gifts and dinners, paid Barnett's rent, and paid for the hotel in which she stayed the night of the murder.

Several days before the murder, Defendant told a friend, Jason Fortune, that her father owned a certificate of deposit worth at least $100,000. She added that if he were to die, she would get that money. During trial, Fortune testified that Defendant had fantasized about what she could buy with all the money. In fact after his death, her father's estate was valued at $482,000, including a $100,000 certificate of deposit, a little under $50,000 in a savings account, and a life insurance policy with death benefits of $180,000.

On the day before the shooting, Defendant, her sister and several others went to the V.P. Fair and then to a restaurant to eat. At approximately 4:15 to 4:30 a.m. the next morning, Defendant and her sister returned home to get their dog, after which they were going to spend the night at a motel. Defendant did not enter her home through the door but through a basement window. In the basement, she saw the rifle leaning against a chair. In her subsequent confession to police, Defendant stated, "I decided at that moment that I was going to do it, I was going to kill him." She then walked upstairs and shot her father, first in the shoulder as he was lying "passed out" on the couch. This bullet broke his collar bone and awakened him. He jumped up and asked Defendant to phone for help. Defendant went downstairs to look for a phone but thought to herself, "He didn't deserve to live." She returned to find him again lying on the couch. She then took the rifle from where she had placed it and shot her father at point-blank range in the head, thereby killing him.

After the murder, Defendant took the rifle and left through the basement window in which she had entered the house. She and her sister spent the night at a motel, and the next day took the rifle to Barnett for him to dispose of. He sold the rifle to a friend and later informed the police to whom he sold it.

The next day, Defendant and Fortune went to her house and Defendant cleaned out her car. Then they staged a scene in which Fortune said loudly so neighbors could hear, "Stacey, call the police." Defendant then ran to a neighbor's home, upset and crying. The neighbor went to Defendant's house, discovered the body, and called for emergency help.

Defendant, her sister and Fortune were subsequently taken to the police station for

questioning. The police wanted to ask Defendant about anyone who may have had a reason to kill her father. While she was not considered a suspect at first, Fortune implicated her in the murder while he was being questioned. At this point, Defendant became a suspect and was read her *Miranda* rights after which she gave a statement admitting her guilt. Additionally, she later reenacted the murder for the police officers while being videotaped.

Defendant's defense at trial was not guilty by reason of mental disease or defect. She presented one expert witness concerning this defense, while the State presented two rebuttal expert witnesses. Defendant wished to additionally use the battered spouse syndrome defense and jury instruction. The trial court denied this request. However, it instructed Defendant that she was allowed to make an offer of proof showing evidence of battered spouse syndrome and injecting the issue of self-defense so that she could mention battered spouse syndrome during trial. Defendant failed to do so.

■ In her first point on appeal, Defendant claims the trial court erred when it overruled her motion to present battered spouse syndrome evidence on the issue of self-defense and when it failed to instruct the jury on the defense of self-defense. In a pre-trial motion, Defendant presented the court with her intent to offer evidence of the battered spouse syndrome defense and related suggestions in support. The trial court sustained the State's reply motion to exclude said evidence "to the extent of excluding anyone from mentioning in trial that defendant suffered from Battered Spouse Syndrome until such time as self-defense is injected into the case; . . . defendant is permitted to make an offer of proof showing evidence injecting self-defense in order to mention Battered Spouse Syndrome in her opening statement and trial." The trial court allowed Defendant to present testimony of her alleged abuse to aid in establishing her mental disease or defect defense and to aid in refuting the State's claim that she met all the crimes' elements.

Defendant did not inject self-defense into the case either by an offer of proof or by any other means. The trial court specifically instructed Defendant she must do so in order to discuss battered spouse syndrome before the jury. Defendant presented no evidence of self-defense nor did she make an offer of proof. Therefore, this issue is not preserved for appeal. *Eckert v. Thole*, 857 S.W.2d 543, 546 (Mo.App.E.D.1993); *State v. Williams*, 807 S.W.2d 200, 202 (Mo.App.1991).

■ Also within Point I, Defendant asserts trial court error in failing to instruct the jury on self-defense. To be entitled to a self-defense instruction, it must be supported by the evidence when viewed in the light most favorable to defendant. *State v. Weems*, 840 S.W.2d 222, 226 (Mo. banc 1992). Here, however, there was no evidence of self-defense presented and thus Defendant was not entitled to said instruction. *Id.* Point denied.

■ Defendant's second point on appeal claims trial court error in the court's failure to suppress her statements admitting guilt and her video reenactment of the murder. When reviewing a trial court's decision concerning a motion to suppress evidence, we determine whether its decision is supported by sufficient evidence. *State v. Hyland*, 840 S.W.2d 219, 222 (Mo. banc 1992). In doing so, we view all facts and inferences reasonably arising therefrom favorably to the challenged order, and we may ignore evidence which is not favorable to the order. *State v. Fuente*, 871 S.W.2d 438, 441–2 (Mo. banc 1994); *State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo. banc 1990). We must affirm the trial court's decision if sufficient evidence supports it. *Id.*

To support her argument, Defendant claims her statements were given directly following a custodial interrogation in which she was not given *Miranda*[1] warnings; and when considering the totality of the circumstances, the statements were not voluntary. We disagree. The police did not consider Defendant a suspect until Fortune implicated her. Prior to this, she was being questioned solely to determine whether her father had

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

any enemies or if she knew of anyone who would have any motivation to kill him. Once the officers learned of Fortune's statements, they immediately Mirandized Defendant. The record is more than sufficient to support the trial court's decision. Point denied.

■ Defendant claims in her third point the trial court erred when it failed to require the State to give gender-neutral reasons for its peremptory strikes of female members of the panel. We agree. The United States Supreme Court recently extended its *Batson*[2] decision in the case of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *State v. Hayden*, 878 S.W.2d 883 (Mo.App.E.D.1994). In *J.E.B.*, the Court held that, during voir dire, gender bias violates the equal protection clause; and the *Batson* rules and requirements concerning racial bias during jury selection now apply equally to gender bias. *J.E.B.*, 511 U.S. at ——, ——-——, 114 S.Ct. at 1422, 1429–30. Because Defendant properly objected to the State's strikes during voir dire, we remand to the trial court for a *Batson* hearing in which the State must give its reasons for peremptorily striking prospective female jurors.

■ In Defendant's fourth point on appeal, she alleges the trial court erred in admitting autopsy photographs as well as photographs and a videotape of the crime scene because any probative value was greatly outweighed by the prejudicial effect. We disagree. A trial court is vested with broad discretion in deciding whether to admit or to exclude photographs. *State v. Feltrop*, 803 S.W.2d 1, 10 (Mo. banc 1991), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). We may reverse its decision only if the court abused its discretion. *State v. Williams*, 853 S.W.2d 371, 375 (Mo.App. E.D.1993). These photographs are also relevant when they, as in this case, show the body's condition and location. *Feltrop*, 803 S.W.2d at 10. Additionally, gruesome photographs may be admitted when they depict the nature and the location of the wounds. *State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc 1988), *cert. denied*, 488 U.S. 871, 109

S.Ct. 181, 102 L.Ed.2d 150 (1988). Furthermore, the photographs about which Defendant complains were gruesome only because the crime was gruesome. *State v. Clemons*, 643 S.W.2d 803, 805 (Mo. banc 1983). Therefore, considering the wide latitude within which the trial court operates, we find no trial court error in admitting the photographs and videotape. Point denied.

■ Defendant's final point on appeal challenges the motion court's denial of her Rule 29.15 motion without an evidentiary hearing. We find the motion court's ruling is duly supported by the record. Our review is limited to determining whether the motion court's findings of fact, conclusions of law, and ultimate decision are clearly erroneous. Rule 29.15(j); *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991), *Brummell v. State*, 770 S.W.2d 379, 380 (Mo.App.1989). To find the motion court's actions clearly erroneous after reviewing the entire record, we must be left with a definite and firm impression a mistake was made. *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987). A strong presumption exists in favor of defendant's attorney that his or her actions at trial consisted of both reasonable and sound trial strategy. *Id.* at 858. Defendant must show a reasonable probability that but for her attorney's alleged ineffective assistance, the result of her trial would have been different. *Id.; Twenter*, 818 S.W.2d at 635. Finally, to be entitled to a Rule 29.15 hearing, defendant must plead facts, which would warrant relief if found to be true. *State v. Anderson*, 862 S.W.2d 425, 439 (Mo.App.E.D.1993).

■ On appeal, Defendant claims her counsel was ineffective for failing to interview one of the State's psychiatrists before trial and for failing to cross-examine State's witness, Edward Swargulski, as to any bias and/or prejudice. Both claims fail. First, she has not alleged facts, which if true, would warrant relief. Defendant did not show the outcome of her trial would have been different had her attorney interviewed one of the State's two psychiatrists, Dr. Rabun, prior to trial. She merely pleaded her counsel was ill prepared to cross-examine this psychiatrist;

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct.     1712, 90 L.Ed.2d 69 (1986).

however, our review of the record establishes her attorney adequately cross-examined this State witness. Likewise, Defendant did not plead facts which would establish her trial's outcome would have been different but for her attorney's failure to cross-examine Edward Swargulski. Defendant argues Swargulski would have been next in line to inherit the victim's estate were Defendant convicted of murder; therefore, Swargulski had motive to lie. However, Defendant failed to plead facts which show that the result of her trial could have changed if this unconfirmed assertion regarding Swargulski's bias were true. Point denied.

We remand for a gender-*Batson* hearing and affirm on all other issues.

CRANE, P.J., and CRANDALL, J., concur.